1  Paul L. More, SBN 228589
2  F. Benjamin Kowalczyk, SBN 316796
   McCRACKEN, STEMERMAN & HOLSBERRY
3  595 Market Street, Suite 800
4  San Francisco, California 94105
   Tel. No.:   (415) 597-7200
5  Fax No.:   (415) 597-7200
6  E-mail:     pmore@msh.law
7
8  *Attorneys for Petitioner*
9

10              UNITED STATES DISTRICT COURT
11             CENTRAL DISTRICT OF CALIFORNIA
12

| | |
|---|---|
| 13 | |
| 14  INTERNATIONAL | Case No.: 2:18-cv-03681-KS |
| BROTHERHOOD OF | |
| 15  TEAMSTERS, LOCAL 396, | |
| 16 | **INTERNATIONAL** |
| 17          Plaintiff, | **BROTHERHOOD OF** |
|        vs. | **TEAMSTERS, LOCAL 396's** |
| 18 | **BRIEF IN SUPPORT OF** |
| 19  NASA SERVICES, INC.; and DOES | **MOTION TO COMPEL** |
| I through X, | **ARBITRATION** |
| 20 | |
| 21          Respondents. | Date: August 20, 2018, 1:30 p.m. |
| 22 | Judge: Hon. Stephen Wilson |
| 23 | Location: Courtroom 10A |
| 24 | |
| 25 | |

26
27
28

---

MOTION TO COMPEL                                   CASE NO. 2:18-cv-03681-KS

# TABLE OF CONTENTS

BACKGROUND ................................................................................ 2

*The "Zero Waste LA" Exclusive Franchise Ordinance* ............................. 2

*The RFP and NASA's Negotiation of the Labor Peace Agreement* ........... 4

*The LPA's Relation to NASA's Exclusive Franchise* ................................. 6

*The City's Award of an Exclusive Franchise to NASA* ............................. 8

*The Union's Meetings with NASA and Demand for Arbitration* ............ 10

ARGUMENT ................................................................................. 12

I.    NASA Bears the Heavy Burden of Demonstrating That the Parties' Dispute is Not Arbitrable ............................................................. 12

II.    Whether the Agreement "Became Null and Void" on January 1, 2017 is for the Arbitrator to Decide .......................................................... 14

    A.    Under *Buckeye Check Cashing*, only challenges to an arbitration clause, not challenges to the contract itself, are for the courts to decide. ................................................................................. 14

    B.    Disputes over the effectiveness of conditions precedent are arbitrable under *Buckeye Check Cashing*. ........................................... 18

C.   The parties do not have a dispute about contract formation within the meaning of *Granite Rock*.................................................................. 20

III.   NASA Waived Its Claim that the LPA Became Void by Accepting the Agreement's Benefits. ........................................................................... 22

IV.   NASA Is Required to Pay the Union's Legal Expenses as a Matter of Contract. ............................................................................................... 24

MOTION TO COMPEL                                          CASE NO. 2:18-cv-03681-KS

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Bridgeport Mgmt., Inc. v. Lake Mathews Mineral Properties, Ltd.*,
No. 14-CV-00070-JST, 2014 WL 953831 (N.D. Cal. Mar. 6, 2014) ........................................................................ 14

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006) ................................................................ *passim*

*Capitol Vial, Inc. v. Weber Scientific*,
966 F.Supp. 1108 (M.D.Ala. 1997) ...................................... 19

*Citicorp Real Estate, Inc. v. Smith*,
155 F.3d 1097 (9th Cir. 1998) ............................................. 22

*Dennis L. Christensen General Building Contractor, Inc., v. General Building Contractor, Inc.*,
952 F.2d 1073 (9th Cir. 1991) ............................................. 13

*Directors of Motion Picture Indus. Pension Plan v. Nu Image Inc.*,
No. 2:13-CV-03224-CAS, 2014 WL 808859 (C.D. Cal. Feb. 28, 2014) ....................................................................... 24

*Granite Rock Co. v. International Brotherhood of Teamsters*,
561 U.S. 287 (2010) ......................................................... 20, 21

*Granite Rock. Solymar Investments, Ltd. v. Banco Santander S.A.*,
672 F.3d 981 (11th Cir. 2012) ............................................. 20

*Hotel Employees & Rest. Employees Union, Local 2 v. Marriott Corp.*,
No. C-89-2707 MHP, 1993 WL 341286 (N.D. Cal. Aug. 23, 1993) ............................................................................. 22

iii

*Hotel Employees & Restaurant Employees Local 2 v. Marriott Corp.*,
  961 F.2d 1464 (9th Cir. 1992) ........................................................... 12, 23

*Matthews v. Nat'l Football League Mgmt. Council*,
  688 F.3d 1107 (9th Cir. 2012) ................................................................. 13

*Morgan v. Gonzales*,
  495 F.3d 1084 (9th Cir. 2007) ................................................................. 24

*Moses Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ..................................................................................... 13

*Nash v. UCSF Med. Ctr.*,
  No. 11-CV-4473 JSC, 2013 WL 4487503 (N.D. Cal. Aug. 19, 2013) ............................................................................................... 22

*Navarro v. F.D.I.C.*,
  371 F.3d 979 (7th Cir. 2004) ................................................................... 17

*Nicaragua v. Standard Fruit Company*,
  937 F.2d 469 (9th Cir. 1991) ................................................................... 15

*Oil Chem. & Atomic Workers Int'l Union v. Union Oil Co. of California*,
  457 F.Supp. 179 (C.D. Cal. 1978) .......................................................... 14

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967) ................................................................................. 20

*Rent-A-Ctr., W., Inc. v. Jackson*,
  561 U.S. 63 (2010) ................................................................................... 15

*Service Employees Int'l Union v. St. Vincent Medical Ctr.*,
  344 F.3d 977 (9th Cir. 2003) ................................................................... 12

*Sheet Metal Workers' Int'l Ass'n v. United Transp. Union*,
  767 F. Supp. 2d 161 (D.D.C. 2011) ........................................................ 20

*Smart v. Int'l Broth. Of Elec. Workers, Local 702*,
  315 F.3d 721 (7th Cir. 2002) ................................................................... 13

iv

*South Bay Boston Mgmt., Inc. v. Unite Here Local 26*,
    587 F.3d 35 (2009) ............................................................ 12, 23

*Tompkins v. 23andMe, Inc.*,
    840 F.3d 1016 (9th Cir. 2016) ...................................... 15

*Transdyn/Cresci v. City & Cty. of San Francisco*,
    72 Cal.App.4th 746 (1999) ............................................ 16

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
    182 F.R.D. 97 (S.D.N.Y. 1998) ..................................... 18

*Unite Here Local 217 v. Sage Hosp. Res.*,
    642 F.3d 255 (1st Cir. 2011) ......................................... 21

*Unite Here Local 355 v. Calder Race Course, Inc.*,
    No. 10-22355-CIV, 2010 WL 11553588 (S.D. Fla. Dec. 7, 2010) ........... 19

*United Brotherhood of Carpenters & Joiners of America, Local
    No. 1780 v. Desert Palace, Inc.*,
    94 F.3d 1308 (9th Cir. 1996) ......................................... 13

*United Steel, Paper, etc. v. TriMas Corp.*,
    531 F.3d 531 (7th Cir. 2008) .......................................... 12

*United Steelworkers v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574 (1960) ........................................................ 13

*Williams v. City of Stockton*,
    195 Cal. 743 (1925) ........................................................ 17

**Federal Statutes**

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ........................ 13, 14, 15

    9 U.S.C. § 4 ................................................................... 14

    9 U.S.C. § 10 ................................................................. 14

Labor-Management Relations Act, 29 U.S.C. § 185 .......... 12, 13, 14, 22, 24

v

**State Statutes**

Cal. Civil Code § 1691 ................................................................. 22

**Other Authorities**

City of Los Angeles Bureau of Sanitation, "Final Report:
Exclusive Commercial and Multifamily Solid Waste Franchise
Hauling System Implementation Plan" (April 2013).................................. 2

MOTION TO COMPEL                                    CASE NO. 2:18-cv-03681-KS

## INTRODUCTION

Teamsters Local 396 (the "Union") and NASA Services, Inc. ("NASA") executed a "Labor Peace Agreement" (the "LPA") in late 2014.  Being party to such an agreement was a condition of NASA obtaining a lucrative waste-hauling franchise with the City of Los Angeles.  The LPA contains a broad arbitration clause, under which "any dispute over the interpretation or application" of the agreement is subject to arbitration.  The LPA also includes several conditions, which relate to NASA obtaining a city franchise.  The parties have a dispute over the meaning and application of one such condition: whether the City "entered into an exclusive franchise agreement" with NASA prior to January 1, 2017.  The Union maintains that the City did, because all of the discretionary, legislative requirements for entering the franchise agreement were met before that date and the final step of signing the contract was ministerial and mandatory.  NASA seeks to avoid its obligations under the LPA—despite having relied on the validity of the LPA to obtain and maintain its exclusive franchise—by arguing that its franchise agreement with the City was not signed by the City's Board of Public Works President until January 31, 2017.

Under well-established precedent, this dispute over the meaning of the parties' agreement is a matter for arbitration.  NASA's challenge is to the validity of the parties' entire agreement, not specifically to its arbitration clause.  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006).

Even if NASA were correct that interpreting the LPA's condition were a matter for the Court—and even if the Court agreed that NASA could avoid its bargain with the Union based on the LPA's language—NASA did not promptly repudiate the LPA when the Union invoked it in February 2017.  Instead, NASA benefited from the LPA's restrictions against the

1

Union striking or taking other economic action against it and from the exclusive franchise in obtained based on the LPA's existence and validity. Under these circumstances, NASA has waived any claim that the LPA became void based the agreement's terms.

## BACKGROUND

### The "Zero Waste LA" Exclusive Franchise Ordinance

In April 2014, the City of Los Angeles adopted the "Zero Waste LA" Exclusive Franchise Ordinance (the "Franchise Ordinance"), Ordinance No. 182986. *See* Request for Judicial Notice ("RJN"), Exh. 1. The Franchise Ordinance replaced Los Angeles's previous, permit-based commercial and multi-family residential solid-waste collection system with an exclusive franchise system.[1] The Franchise Ordinance divided the City into eleven franchise "zones", each of which has a designated exclusive waste-hauler for commercial and multi-family residential collection. Franchise Ordinance, RJN, Exh. 1, at § 66.33.4. The Franchise Ordinance set other substantive standards that are designed to increase the diversion of solid waste from landfills and to increase recycling and composting, all in order to meet the City's goal of achieving "zero waste" by 2030. *Id.*, at § 66.33 ("Purpose").

The City expected that the move from a largely unregulated permit system to an exclusive franchise system would yield significant environmental benefits. But it also recognized that creating exclusive, zone-based franchises increased the potential that labor disputes would interfere with waste collection. It therefore required that exclusive franchise haulers be parties to agreements with labor unions that barred

---

[1] *See, generally*, City of Los Angeles, Bureau of Sanitation, "Final Report: Exclusive Commercial and Multifamily Solid Waste Franchise Hauling System Implementation Plan" (April 2013), at 1.1. Available at: https://www.lacitysan.org/cs/groups/public/ documents/document/mhfh/mdax/~edisp/qa001033.pdf (last visited July 23, 2018).

strikes, picking and other economic actions against city waste-collection services.  As the City put it:

> While the move to an exclusive franchise system will generate many benefits for the City and its residents, it will also increase the risk that a labor dispute will interfere with collection services.  To protect the City's interest in efficient and uninterrupted collection services, the City will require franchisees to produce evidence that they are parties to written, enforceable agreements that prohibit labor organizations and their members from engaging in picketing, work stoppages, boycotts or other economic interference with collection services.

*Id.*, at § 66.33.

This requirement that franchisees be parties to "labor peace agreements" is contained in Franchise Ordinance § 66.33.6(c).  That provision makes clear that being *party* to a labor peace agreement is a prerequisite to being granted a franchise and is an ongoing requirement of being a franchisee:

> As a condition for the grant of a franchise agreement, a condition precedent to any franchisee or subcontractor performing collection services, and as an ongoing, material condition of the franchise agreement, each franchisee shall provide satisfactory evidence that it, and any subcontractor who will provide collection services, are a party to labor peace agreement(s) with any labor organization that represents any group of the franchisee's or subcontractor's employees who are or will be involved in providing collection services, and with any labor organization that seeks to represent any group of a franchisee's or subcontractor's employees who are or will be involved in providing collection services[.]

*Id.*, at § 66.33.6(c).  The Franchise Ordinance defines a "labor peace agreement" as "an enforceable agreement between a franchisee . . . and a labor organization . . . that represents or seeks to represent the franchisee's . . . employees providing collection services and that contains provisions

3

under which the labor organization for itself and its members agrees to refrain from engaging in any picketing, work stoppages, or any other economic interference with the franchisee's performance of collection services." *Id.*, at § 66.33.1(6).

### The RFP and NASA's Negotiation of the Labor Peace Agreement

Consistent with the terms of the Franchise Ordinance, the City's Bureau of Sanitation issued a Request for Proposals on June 11, 2014. Bureau of Sanitation, Request for Proposals: Citywide Exclusive Franchise System for Municipal Solid-Waste Collection and Handling ("RFP"), RJN, Exh. 2. Section 2.4.5.1 of the RFP required that proposers be party to a labor peace agreement:

> In accordance with Section 66.33.6(c) of the Los Angeles Municipal Code, the CONTRACTOR shall provide satisfactory evidence that it, and any SUBCONTRACTOR who will provide collection services, are a *party* to labor peace agreement[.]

*Id.*, at § 2.4.5.1 (emphasis added). Section 3.10.15.6 of the RFP required applicants to submit "[a]n affidavit verifying compliance with Article 2.4.5.1 of this RFP and Section 66.33.6(c) of the Los Angeles Municipal Code." *Id.*, at § 3.10.15.6 (p. 68). The RFP included a certification form on which the proposer would attest that it was a party to a labor peace agreement ("Form 15 - Evidence of Signed Labor Peace Agreement"). *See id.*, at p. viii.

In September 2014, NASA approached Teamsters Local 396 about negotiating a labor peace agreement. The parties' representatives agreed on a labor peace agreement on October 24, 2014, and Union and NASA representatives signed the agreement on October 26 and October 27, 2014, respectively. More Decl., ¶ 2; Pet. to Compel, Doc. No. 1, Exh. A.

The labor peace agreement ("LPA") covers certain employees at NASA's facility at 1100 S. Maple Avenue in Montebello, California. Doc.

4

No. 1, Exh. A, at ¶ 1.  Under the LPA, the Union agrees that "[d]uring the term of this Agreement, the Union will not engage in striking, picketing or other economic activity at the facility."  *Id.*, Exh. A, ¶ 11.  The LPA contains other substantive provisions, including NASA's agreement to remain neutral toward its employees' decision on whether or not to unionize, certain rights for the Union to access NASA's facility and communicate with its employees, a procedure for recognizing the Union as the majority representative of the covered employees, and provision for interest arbitration if the parties are unable to reach agreement on a first collective bargaining agreement.  *Id.*, Exh. A, ¶¶ 4, 7-10.

The LPA also contains a broad arbitration provision, which states: "The parties agree that any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration." *Id.*, Exh. A, ¶ 14.

The parties could not mutually agree on named arbitrators to include in the LPA prior to its execution, so the LPA instead contains a procedure for selecting arbitrators "if the parties are not otherwise able to agree upon a permanent arbitrator."  *Id.*, Exh. A, ¶ 14.  The parties agreed in Paragraph 14 that if they were unable to agree on permanent arbitrators within 30 days after the LPA's execution, they would obtain a list of arbitrators from the Federal Mediation and Conciliation Service and alternatively strike names.  *Ibid.*  The parties also agreed that "[a]ny party who unsuccessfully resists arbitration or an arbitration award under this Agreement shall be liable for the other party's legal fees and expenses for enforcement."  *Ibid.*

NASA relied on the executed LPA in responding to the exclusive-franchise RFP and, ultimately, in obtaining a lucrative exclusive waste-hauling franchise from the City.  NASA submitted a signed "Form 15"

along with its RFP response.  This signed verification (which the Union countersigned) stated that "[t]he Company is party to an agreement with Teamsters Local 396 that meets the definition of a Labor Peace Agreement."  More Decl., ¶ 4, Exh. 1.  The Union is unaware of any subsequent representation by NASA to the City that it was, in fact, *not* a party to an LPA that would qualify it for consideration as a franchisee or that the LPA is no longer in effect.

After the execution of the LPA, NASA's and the Union's attorneys conferred, pursuant to Paragraph 14, over the identity of the arbitrator to hear disputes under the LPA.  More Decl., ¶ 5.  Because those negotiations took more than the 30 days prescribed in Paragraph 14, the Union sought, and NASA granted, an extension on the deadline to choose arbitrators.  *Id.*, ¶ 5, Exh. 2.  The parties ultimately reached agreement on Arbitrator Michael Rappaport as the permanent arbitrator under the LPA.  The parties memorialized this agreement in an "Addendum to Memorandum of Agreement."  More Decl., ¶ 6, Exh. 3.  The Addendum recited that the parties had entered into the LPA on October 24, 2014 and that Paragraph 14 of that Agreement "provides for expedited and binding arbitration of disputes arising over the interpretation or application of the Agreement."  *Ibid.*

### The LPA's Relation to NASA's Exclusive Franchise

The LPA contains several provisions addressing the relationship between the LPA and the City's award of an exclusive franchise to NASA under the Franchise Ordinance.  These provisions will be analyzed in more detail in the "Argument" Section below, but will be summarized here.

First, Paragraph 1 of the LPA states that "[t]he terms of this Agreement shall only become operative if all of the conditions set forth in

paragraph 15 are satisfied." Paragraph 1 thus recites Paragraph 15 as containing the relevant provisions on the "operation" of the Agreement.

Paragraph 15 contains three provisions on the relationship between the LPA and the award of an exclusive franchise. First, it states: "All of the paragraphs of this Agreement are expressly conditioned on the City of Los Angeles entering into an exclusive franchise agreement or franchise agreements with the Employer for the collection of solid waste pursuant to the City of Los Angeles Municipal Code, Article 6, Chapter VI, §§ 66.33.1 *et seq.*" Doc. 1, Exh. A, at ¶ 15. As will be demonstrated below, this condition is met. It is not disputed that NASA has entered into an exclusive franchise agreement with the City.

Second, Paragraph 15 states that "[i]f the City enters into an exclusive franchise agreement for the collection of solid waste with the Employer, then the terms of this Agreement shall remain in effect for three years following the effective date of the exclusive franchise agreement between the City and the Employer." Doc. 1, Exh. A, at ¶ 15. Again, there is no dispute that NASA has entered into an exclusive franchise with the City, so the condition triggering a three-year term to the LPA is also met.

The parties dispute the meaning of Paragraph 15's third sentence. It states that "[i]f the City fails to enter into an exclusive franchise agreement for the collection of solid waste with the Employer by December 31, 2016, then this Agreement shall *become null and void.*" Doc. 1, Exh. A, at ¶ 15 (emphasis added).

As described in more detail below, the Union's position is that this condition was met—and the LPA did not "become null and void" on December 31, 2016—because the City "entered into an exclusive franchise agreement" with NASA prior to December 31, 2016. The fact that a city official did not complete the ministerial act of physically signing the

7

exclusive franchise agreement until January 31, 2017 does not destroy the benefit of the parties' bargain.  NASA's position, by contrast, is that the parties' LPA—which was an essential condition on which NASA received the exclusive franchise in the first place—was nullified because the City's Commissioner of Public Works did not sign the exclusive franchise agreement until January 31, 2016.  This brief will demonstrate that the question of who is right is a matter of contractual interpretation for an arbitrator to decide.

### The City's Award of an Exclusive Franchise to NASA

The City went through a multi-step process in awarding exclusive franchises under the Franchise Ordinance.  The City's Bureau of Sanitation and Bureau of Contract Administration created evaluation teams to review and rank the fifteen waste-hauling companies that submitted proposals responsive to the RFP.  *See* Department of Public Works, Authority to Award Contracts for the Zero Waste LA Exclusive Franchise System for Commercial and Multifamily Solid Waste Collection and Handling – Bureau of Sanitation (LASAN)" (September 26, 2016), RJN, Exh. 3, at 11-15.  Based on these evaluations, the City selected a smaller group of proposers, including NASA, with which to negotiate franchise agreements.  *Id.*, Exh. 3, at 16.  Negotiations over the contents of the exclusive franchise agreements continued until July 2016.  *Id.*, Exh. 3, at 17.

Following the negotiation of an exclusive franchise agreement, the Bureau of Sanitation recommended to the City's Board of Public Works that NASA be awarded the exclusive franchise for the "Downtown" franchise zone, a zone comprising some 1,700 commercial and multi-family residential accounts.  *Id.*, Exh. 3, at 19.  The Bureau of Sanitation forwarded its recommendation to the Board of Public Works, which unanimously approved the recommendation that NASA be awarded the

8

Downtown zone, approved the franchise agreement between NASA and the City, and forwarded the report and the franchise agreement to the Mayor and the City Council.  *See* Journal of the Board of Public Works, September 26, 2016, RJN, Exh. 4.  The Board of Public Works described the ministerial act that would follow once NASA's franchise agreement was approved by the Mayor and the City Council: "Upon the Mayor's and the Council's authorization, the President or two members of the Board *will execute* the contract[.]"  *Ibid.* (emphasis added).

The Mayor approved NASA's exclusive franchise agreement (and the other franchisees' agreements) on November 3, 2016 and forwarded the matter to the City Council.  *See* Mayor of the City of Los Angeles, Transmittal: Seven Franchise Agreements for Commercial and Multi-family Solid Waste Collection and Handling, RJN, Exh. 5.

The City Council referred the matter to its Energy and Environment Committee, which recommended that the Council approve the franchise agreements and authorize the Board of Public Works to "execute a personal services contract for the City's Exclusive Franchise System for commercial and multifamily solid waste collection and handling with" NASA.  City of Los Angeles Council, Energy and Environment Committee Report, File No. 10-1797-S17; 10-1797-S16, RJN Exh. 6.  The City Council approved the Committee Report—and with it, the franchise agreement between the City and NASA—on December 9, 2016.  *See* Official Action of the Los Angeles City Council, File No. 10-1797-S17, RJN, Exh. 7.  The City Council's action approving NASA's franchise agreement and directing the Board of Public Works to execute the contract became final on December 13, 2016.  *Ibid.*

The President of the Board of Public Works executed NASA's exclusive franchise agreement on January 31, 2017.  *See* Personal Services Contract Between the City of Los Angeles and NASA Services, Inc.

9

("Franchise Agreement"), Contract No. C-128876, RJN Exh. 8, at p. 142.
NASA's President, Arsen Sarkisian, had executed the franchise agreement
on September 5, 2016, and the City Attorney's Office had approved it as to
form on September 15, 2016.  Franchise Agreement, RJN Exh. 8, at p. 142.

Section 3.15 of NASA's exclusive franchise contract requires that
NASA "provide, and maintain for the term of the Agreement, satisfactory
evidence that it complies with [L.A. Municipal Code] Section 66.33.6(c)"—
the requirement that NASA be a party to a labor peace agreement.
Franchise Agreement, RJN Exh. 8, at p. 26.  The existence of a valid labor
peace agreement with the Union was therefore a condition on which the
City entered into the exclusive franchise agreement with NASA.

### The Union's Meetings with NASA and Demand for Arbitration

On February 14, 2017, the Union sent NASA a notice of its intent to
organize, as provided for in Paragraph 7 of the LPA.  Smith Decl., ¶ 2, Exh.
1.  The Union did not hear back from NASA, and so it sent a second notice
on April 10, 2017.  *Id.*, ¶ 3, Exh. 2.  After this second notice, the Union
began to communicate with a consultant of NASA's named Mario Beltran.
*Id.*, ¶ 4.  During the conversations that Union representatives had with Mr.
Beltran, he did not assert that the parties' LPA was void or not in effect.

Instead, Mr. Beltran brokered a meeting between the Union's
representatives and NASA's officials.  This meeting took place on July 24,
2017 at a restaurant called Vespaio, in downtown Los Angeles.  *Id.*, ¶ 5.
Present at this meeting were Union Secretary-Treasurer Ron Herrera,
Union Director of Organizing Jim Smith, Union Vice President Javier
Bonales, Mr. Beltran, NASA's President Arsen Sarkisian, and NASA
official Nick Sarkisian.  The Union expressed its displeasure that NASA
had not complied with its obligations under the LPA, such as providing the
Union with a list of its employees and agreeing to allow union

representatives to access its facilities.  Neither Mr. Sarkisian nor Mr. Beltran asserted at this meeting that the parties' LPA was void or inoperative.  Instead, they told the Union that it had been difficult to comply with the LPA because NASA was still transitioning into the city franchise.  Mr. Sarkisian asked that NASA be given time to transition before the Union began organizing under the LPA.  The Union's Secretary-Treasurer agreed, and asked Mr. Smith and Mr. Beltran to follow up with a plan on complying with the LPA.  *Ibid*.

Mr. Beltran, Union Organizing Director Jim Smith, and Union Secretary-Treasurer Ron Herrera held another meeting on August 14, 2017 at the Union's offices in Covina, California.  *Id.*, ¶ 6.  At this meeting, Mr. Beltran and the union officials continued their discussion of a timeline for NASA's compliance with the LPA.  At no point during this meeting did Mr. Beltran state that NASA believed the LPA to be inoperative or void.  Mr. Beltran told the Union that NASA would provide the information required of it in the LPA in the near future, and asked Mr. Smith to reach out to him again.  Mr. Smith did so over the ensuing month and a half.  *Id.*, ¶ 7, Exh. 3.  Again, Mr. Beltran did not respond by informing the Union that the LPA was not in effect.  Instead, he told Mr. Smith that he was meeting with NASA's owners, which the Union understood to mean that NASA would soon comply with its obligations.

Throughout 2017, the Union forewent its federally protected rights to picket and take other economic action against NASA.  It did not picket or boycott NASA—something that it would normally do against a recalcitrant employer—because the LPA forbids it from doing so.  If NASA had responded to the Union's notices of its intent to organize employees in February 2017 by stating forthrightly its position that it believed the LPA to be void, then the Union might have elected to take economic action

MOTION TO COMPEL                                    CASE NO. 2:18-cv-03681-KS

against NASA at a time when it was particularly vulnerable, during its transition to the new franchise.  Smith Decl., ¶ 8.  Instead, NASA benefited from a year (and more) of labor peace with the Union based on a contract that it now claims to have always been null and void.

On November 28, 2017—after months of delay from NASA—the Union informed Arbitrator Rappaport that the Union and NASA had a dispute under the LPA.  More Decl., ¶ 7, Exh. 4.  On December 8, 2017, NASA's counsel wrote to Arbitrator Rappaport, declining to arbitrate and stating that "NASA and Local 396 are not parties to any agreement."  *Id.*, ¶ 8, Exh. 5.  On February 2, 2018, the Union wrote to NASA's counsel, citing *Buckeye Check Cashing*, 546 U.S. 440, 446 and asking NASA to reconsider its refusal to arbitrate the dispute.  *Id.*, ¶ 9, Exh. 6.  NASA again declined to arbitrate the parties' dispute, and this action followed.

## ARGUMENT

### I.   NASA Bears the Heavy Burden of Demonstrating That the Parties' Dispute is Not Arbitrable.

Labor peace agreements like the one here are governed by Labor-Management Relations Act ("LMRA"), Section 301, 29 U.S.C. § 185.  *See, e.g.*, *Service Employees Int'l Union v. St. Vincent Medical Ctr.*, 344 F.3d 977, 979 (9th Cir. 2003); *Hotel Employees & Restaurant Employees Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1466 (9th Cir. 1992); *United Steel, Paper, etc. v. TriMas Corp.*, 531 F.3d 531, 533 (7th Cir. 2008); *see also* Doc. No. 10, ¶ 1(e) (recognizing jurisdiction under § 301).  Relying on the federal common-law principles developed under § 301, federal courts have ordered arbitration of disputes arising out of these agreements.  *TriMas Corp.*, 531 F.3d at 533; *St. Vincent Medical Center*, 344 F.3d at 985-86; *South Bay Boston Mgmt., Inc. v. Unite Here Local 26*, 587 F.3d 35, 38 (2009).

1    Courts "rigorously enforce agreements to arbitrate." *Moses Cone*

2  *Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983).  "In labor

3  contracts with arbitration clauses, the presumption of arbitrability is very

4  strong."  *Dennis L. Christensen General Building Contractor, Inc., v.*

5  *General Building Contractor, Inc.*, 952 F.2d 1073, 1076 (9th Cir. 1991).

6  "[W]here the contract contains an arbitration clause, there is a

7  presumption of arbitrability in the sense that '[a]n order to arbitrate the

8  particular grievance should not be denied unless it may be said with

9  positive assurance that the arbitration clause is not susceptible of an

10  interpretation that covers the asserted dispute.  Doubts should be resolved

11  in favor of coverage.'"  *Id.* at 1076-1077 (quoting *AT&T Technologies v.*

12  *Communications Workers*, 475 U.S. 643, 650 (1986)); *United Steelworkers*

13  *v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). "The party

14  challenging arbitrability bears the burden of showing a [labor-management

15  agreement] excludes a particular dispute from arbitration." *United*

16  *Brotherhood of Carpenters & Joiners of America, Local No. 1780 v. Desert*

17  *Palace, Inc.*, 94 F.3d 1308, 1309 (9th Cir. 1996).

18    Courts have applied Federal Arbitration Act ("FAA") procedures to §

19  301 claims for breach of an arbitration provision to the extent they are

20  consistent with the LMRA.  *See Matthews v. Nat'l Football League Mgmt.*

21  *Council,* 688 F.3d 1107, 1115 & n. 7 (9th Cir. 2012) (applying the FAA in a

22  case brought pursuant to § 301); *Smart v. Int'l Broth. Of Elec. Workers,*

23  *Local 702,* 315 F.3d 721, 724 (7th Cir. 2002) ("The Federal Arbitration Act

24  has no particular reference to [collective bargaining] contracts and so if

25  there were a conflict between the two statutes we would resolve it in favor

26  of section 301.  Where there is no conflict, however, and the FAA provides a

27  procedure or remedy not found in section 301 but does not step on section

28  301's toes, then . . . we apply the Federal Arbitration Act." (citation

13

omitted); *Oil Chem. & Atomic Workers Int'l Union v. Union Oil Co. of California*, 457 F.Supp. 179, 180 (C.D. Cal. 1978) (applying § 4 of the FAA to petition to compel arbitration of action arising under § 301)

Under the FAA, a party "aggrieved by the alleged . . . refusal of another to arbitrate" may file a petition in federal district court for an order compelling arbitration in the manner provided for in the agreement. *Id.* § 4. The FAA supersedes the normal operation of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 81(a)(6)(B). An application under the FAA is made and heard in the manner provided for the making and hearing of motions. 9 U.S.C. § 10; *see Bridgeport Mgmt., Inc. v. Lake Mathews Mineral Properties, Ltd.,* No. 14-CV-00070-JST, 2014 WL 953831, at *3 (N.D. Cal. Mar. 6, 2014) ("The FAA provides for petitions to be treated as motions, not complaints."). The summary procedure under the FAA is consistent with the strong federal policy in favor labor arbitration.

## II. Whether the Agreement "Became Null and Void" on January 1, 2017 is for the Arbitrator to Decide.

### A. Under Buckeye Cashing, only challenges to an arbitration clause, not challenges to the contract itself, are for the courts to decide.

In *Buckeye Check Cashing, Inc. v. Cardegna*, *supra*, 546 U.S. 440, the Supreme Court held that under federal law, arbitration clauses are severable from the remainder of the contract and that only challenges to the validity of an arbitration clause itself are matters for the courts:

> First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.

440 U.S. at 445-46 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395 (1967)). The question of whether the parties' agreement

14

was void due to usurious interest rates was for the arbitrator, because the challenge was to the validity of the entire contract.  The Court recognized that enforcing this rule "permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void.  But it is equally true that respondents' approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." *Buckeye Check Cashing*, 546 U.S. at 448–49.  The Court resolved this dilemma in favor of arbitration.  *Id.* at 449.

The Supreme Court reiterated the rule in *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010):

> There are two types of validity challenges under § 2: "One type challenges specifically the validity of the agreement to arbitrate," and "[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye*, 546 U.S. at 444.  In a line of cases neither party has asked us to overrule, we held that only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable.

*See also Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1032 (9th Cir. 2016) ("[I]f the plaintiff does not specifically and directly challenge the 'precise agreement to arbitrate at issue,' a court must treat the arbitration agreement as valid under [FAA] § 2 and enforce it, thereby letting the arbitrator decide questions as to the validity of other provisions in the first instance[.]"); *Nicaragua v. Standard Fruit Company*, 937 F.2d 469, 477 (9th Cir. 1991) (the question is not "whether the contract [containing an arbitration clause] was valid or enforceable—just that it existed" and "where the parties admit to signing a document that contains an

arbitration clause . . . all questions regarding breach of the agreement must be referred to arbitration.").

Here, NASA challenges the validity of the *entire agreement* by citing the Paragraph 15's language and claiming that the City did not "enter into an exclusive franchise agreement" with the City by December 31, 2016. NASA does not challenge the arbitration clause contained in Paragraph 14 specifically. NASA's view is that Paragraph 15's language was not met because the Los Angeles Board of Public Works President had not physically signed the Franchise Agreement by that date. Doc. No. 10, at ¶¶ 1(c), 1(d).

By contrast, the Union asserts that the City had "entered into an exclusive franchise agreement" with NASA before December 31, 2016 because it had taken all of the discretionary, legislative steps necessary to enter into the Franchise Agreement.

Under California law, the Board of Public Works President's act of physically signing the document was ministerial and mandatory because the legislative steps of awarding the franchise to NASA were complete. *Transdyn/Cresci v. City & Cty. of San Francisco*, 72 Cal.App.4th 746, 748 (1999). In *Transdyn/Cresci*, the California court of appeal held that the San Francisco Public Utilities Commission's general manager's refusal to sign a public contract after the PUC "had passed an original resolution awarding the contract to appellant pursuant to competitive bidding laws exceeded the scope of the Department Head's legal authority." *Ibid*. The fact that San Francisco's City Charter required the Department Head's "signature" on public contracts did not give the general manager discretion to refuse to sign after the discretionary award of the public contract had taken place. *Id.* at 757. *Transdyn/Cresci* relied on an earlier California Supreme Court decision holding that when a city's mayor, "as an officer of

16

1   the city, was authorized and directed by the duly adopted resolution of the

2   council to sign the same, it became his duty to do so as a duty resulting

3   from his office.  The mayor's duty to sign the contract was ministerial only,

4   and involved the exercise of no discretionary power."  *Williams v. City of*

5   *Stockton*, 195 Cal. 743, 747 (1925).

6       Here, the Union maintains that it should not be denied benefit of its

7   bargain—and the parties' clear intent to have the LPA apply if NASA

8   received a franchise—based on the fact that the Board of Public Works

9   President did not complete the ministerial act of signing the Franchise

10   Agreement until January 31, 2016.  *See Navarro v. F.D.I.C.*, 371 F.3d 979,

11   981 (7th Cir. 2004) ("Conditions precedent are generally disfavored; in

12   resolving doubts about whether a contract contains a condition precedent,

13   interpretations that reduce the risk of forfeiture are favored.") (citing

14   *Restatement* (*Second*) *of Contracts* § 227(1) (1981)).  The discretionary

15   approvals awarding the Franchise Agreement to NASA had all been

16   completed by December 13, 2016.  The Board President—who had already

17   voted with all of his fellow commissioners to enter into the Franchise

18   Agreement with NASA—had a ministerial duty to sign the Franchise

19   Agreement, which he did.  The City had "entered into the exclusive

20   franchise agreement" with NASA within the meaning of Paragraph 15 by

21   December 13, 2016.

22       Because NASA's challenge is not specifically to the parties'

23   arbitration clause, this question of contractual interpretation is for the

24   arbitrator, not for the courts.  *Buckeye Check Cashing*, 546 U.S. at 449

25   ("[A] challenge to the *validity* of the contract as a whole, and not

26   specifically to the arbitration clause, must go to the arbitrator.").  Just as in

27   *Buckeye Check Cashing*, it is possible (though, in the Union's view,

28   unlikely) that the arbitrator could interpret the LPA's language and

17

conclude that the LPA became void under the terms set forth in Paragraph 15.  But the Supreme Court held that the risk that an arbitrator will determine that a contract containing an arbitration clause is void is preferable to a court ignoring the parties' arbitration clause and resolving the parties' contractual dispute in the first instance.  *Buckeye Check Cashing*, 546 U.S. at 448–49.

### B. Disputes over the effectiveness of conditions precedent are arbitrable under *Buckeye Cashing*.

NASA claims that Paragraph 15 contains a "condition precedent" whose operation must be adjudicated by the Court.  Doc. No. 10, at ¶ 1(b).  The language in Paragraph 15 is not that of a condition *precedent* but of a condition *subsequent*.  Paragraph 15 states that if the City does not "enter into an exclusive franchise agreement" by December 31, 2016, then "this Agreement shall *become* null and void."  Doc. No. 1, Exh. A, at ¶ 15.  Something can only "become" null and void if it has been something else previously.

The parties acted as if the LPA was in effect prior to December 31, 2016.  NASA and the Union selected an arbitrator pursuant to Paragraph 14, and NASA granted the Union a 30-day extension on the contractual timeframe for selecting an arbitrator under that Paragraph.  In obtaining a lucrative franchise, NASA represented to the City, without qualification, that it was a "party to an agreement with Teamsters Local Union No. 396 that meets the definition of a Labor Peace Agreement."  More Decl., Exh. 1.

But even if NASA were correct that Paragraph 15 contains a "condition precedent," the job of interpreting this provision to determine whether it is met belongs to the arbitrator.  Federal courts have regularly held that conditions precedent are arbitrable under the *Prima Paint/ Buckeye Check Cashing* rule.  *See, e.g., U.S. Titan, Inc. v. Guangzhou Zhen*

*Hua Shipping Co.*, 182 F.R.D. 97, 102 (S.D.N.Y. 1998), aff'd, 241 F.3d 135 (2d Cir. 2001) ("[I]t has been repeatedly held that even a dispute regarding the satisfaction of a condition precedent to a contract will be referred to arbitration if it may reasonably be said to come within the scope of an arbitration clause."); *Capitol Vial, Inc. v. Weber Scientific,* 966 F.Supp. 1108, 1111 (M.D.Ala. 1997) (a "dispute over a condition precedent to a contract containing an arbitration clause that is broadly enough worded to encompass such a dispute should be arbitrated").

One federal district court applied this line of cases to the claim that a labor peace agreement never came into effect because of the failure of a condition precedent. In *Unite Here Local 355 v. Calder Race Course, Inc.*, No. 10-22355-CIV, 2010 WL 11553588, at *2 (S.D. Fla. Dec. 7, 2010), the union and a race course developer entered into a labor peace agreement covering future employees. In opposing the union's motion to compel arbitration, the developer argued that the agreement was void because a condition precedent—the passage of a 2004 initiative permitting casino-style gaming—did not occur. *Id.* at *1. The court rejected this argument, holding that under *Buckeye Check Cashing*, because the developer's challenge "pertains to the validity of the MOA as a whole and not the arbitration clause itself, the agreement to arbitrate is enforceable, and the question of the contract's validity should go to the arbitrator." *Id.* at *2.

Even if NASA's claim here that the LPA "became null and void" on December 31, 2016 could be characterized as a condition precedent, it is a pure matter of contract interpretation that must be decided by the arbitrator.

### C. The parties do not have a dispute about contract formation within the meaning of *Granite Rock*.

Finally, NASA asserts that the parties' dispute is one of "contract formation" that the Court must resolve under *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287 (2010). Doc. No. 10, at ¶ 1(a). But this misreads the scope of *Granite Rock*, which dealt with the technical failure of contract formation, such as "whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent[.]" *Buckeye Check Cashing*, 546 U.S. at 444 n.1. *Granite Rock* did not purport to overrule *Prima Paint* and *Buckeye Check Cashing*, and did not rule that interpreting a purported condition precedent in an admittedly executed contract is reserved to the courts.

*Granite Rock* involved a different form of contract formation dispute—one similar to the question of whether a contract was signed, but specific to the labor context. In *Granite Rock*, the dispute was over when a collective-bargaining agreement ("CBA") had been ratified by the union's membership. Such ratification was necessary in order for the CBA to be formed, and the date of the ratification was important to determine whether the union had struck in violation of the CBA. *Granite Rock*, 561 U.S. at 292-93. The question of the CBA's ratification date did not involve any interpretation of the CBA; the facts relating to the ratification lay entirely outside of the contract's language. *Id.* at 305-06.

Federal courts have rejected the contention that the applicability of a condition precedent is one of contract formation under *Granite Rock*. *Solymar Investments, Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 997 (11th Cir. 2012) (rejecting characterization of condition precedent to contract as a matter of contract formation under *Granite Rock*); *Sheet*

MOTION TO COMPEL

*Metal Workers' Int'l Ass'n v. United Transp. Union*, 767 F. Supp. 2d 161, 177 (D.D.C. 2011) ("UTU concedes that 'a Merger Agreement was entered into between [SMWIA] and [UTU],' . . . and disputes only whether the conditions precedent to the merger (and the *continuing* effectiveness of the Merger Agreement) have been satisfied.  It is the role of the arbitrator, not the Court, to apply and interpret the terms and conditions of the Merger Agreement.  UTU cannot simply label the dispute as one of contract formation and thereby avoid arbitration.").

NASA does not dispute that it entered into the LPA with the Union or that the LPA contains an arbitration clause under which "any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration."  Doc. No. 1, Exh. A, at ¶ 15.  Nor can NASA dispute that it has represented to the City that the LPA is a valid agreement to which it is a party.  Whether that parties' agreement "became null and void" through the happening of a contractual condition is a matter of contract interpretation for the arbitrator.  Where the parties have indisputably executed a contract with one another containing a broad arbitration clause and then dispute the existence of a condition set forth in the agreement, merely labeling the dispute as one of "contract formation" does not allow a party to bypass arbitration.  *Cf. Granite Rock*, 561 U.S. at 304 n.11 ("[I]t is not the mere labeling of a dispute for contract law purposes that determines whether an issue is arbitrable.").

Moreover, the CBA at issue in *Granite Rock* limited arbitration to disputes that "arise under" the CBA, unlike the arbitration clause in the LPA here, which covers "any dispute over [the Agreement's] interpretation or application."  Doc. No. 1, Exh. A, at ¶ 14; *see Unite Here Local 217 v. Sage Hosp. Res.*, 642 F.3d 255, 262 n.6 (1st Cir. 2011) (distinguishing *Granite Rock* on this basis).  Because the parties committed disputes over

21

the LPA's "interpretation" to arbitration—and jointly selected an arbitrator to hear those disputes—the question of whether the condition set forth in Paragraph 15 have been met is arbitrable.

## III. NASA Waived Its Claim that the LPA Became Void by Accepting the Agreement's Benefits.

When a party believes that an agreement is voidable, it is required to promptly give notice and enforce its rights. If it does not do so and benefits from the contract, then the right is waived. *See, e.g., Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1103 (9th Cir. 1998) ("in order to escape from its obligation the aggrieved party must rescind by prompt notice and offer to restore the consideration received, if any.") (quoting 1 B.E. Witkin, *Summary of California Law, Contracts* § 403 (9th ed. 1987, Supp. 1997)); Cal. Civil Code § 1691; *Nash v. UCSF Med. Ctr.*, No. 11-CV-4473 JSC, 2013 WL 4487503, at *3 n.1 (N.D. Cal. Aug. 19, 2013) (applying California Civil Code § 1691 to voidable contract).

In two cases, federal courts ruling on § 301 motions to compel arbitration under labor peace agreements like the one here have held that the non-performing party's failure to promptly repudiate the agreement constitutes a waiver. In *Hotel Employees & Rest. Employees Union, Local 2 v. Marriott Corp.*, No. C-89-2707 MHP, 1993 WL 341286, at *9 (N.D. Cal. Aug. 23, 1993), San Francisco required that a hotel developer enter into a labor peace agreement with a union. After the hotel was built and operations commenced, the union sought to enforce the agreement but the hotel resisted. The hotel argued that the agreement was the product of economic coercion. The federal district court held, however, that the hotel had waived any claim that the agreement was voidable by benefitting from the agreement, including its bar on the union taking economic action. *Ibid.*

1  ("It should be beyond cavil that a party cannot reap the benefits of a
2  bargain and then exercise its right to rescind.").

3      The First Circuit also held that a party to a labor peace agreement
4  must promptly rescind the agreement when it believes it has a basis to do
5  so. *South Bay Boston Mgmt*, *supra*, 587 F.3d at 41-42. As in the *Marriott*
6  case, the First Circuit held that a party to a voidable contract "may not
7  enjoy[] the benefits of the Agreement" and then claim not to be bound when
8  the union seeks to compel arbitration. *Id.* at 42 ("Because its challenge is
9  not timely, South Bay has thus waived any right it may have had to void
10  the Agreement.").

11      Here, the Union informed NASA of its intent to organize under the
12  LPA on February 14, 2017. NASA did not respond by asserting that it
13  believed the LPA to have become void or inoperative. Nor did NASA do so
14  after the Union sent a second notice of intent to organize in April 2017.
15  Representatives of NASA held two meetings with the Union in July and
16  August 2017. At neither of those meetings did NASA repudiate the LPA or
17  assert that it had become null and void. It was not until the Union stated
18  that it would seek to compel arbitration under the Agreement that NASA
19  asserted that the LPA was inoperative.

20      Throughout this time, NASA benefitted from the LPA because the
21  LPA constrained the Union from exerting economic action against the
22  company. NASA obviously believed that the guarantee of labor peace
23  amounted to valuable consideration when it negotiated the LPA. It
24  acquired an enforceable right to prevent strikes, picketing and other labor
25  disruption. *See American Mfg. Co.*, *supra*, 363 U.S. at 567 (arbitration is
26  the *quid pro quo* for a union's promise not to picket or strike over contract
27  disputes). Such economic action would have been particularly effective
28  during NASA's transition to the exclusive franchise. That may be the

reason why NASA did not alert the Union of its position throughout 2017: it wished to hold off any Union action against it until its new waste-collection franchise was up and running.

NASA also benefitted directly from the LPA because the existence of a valid labor peace agreement was a condition for the City to enter into the Franchise Agreement with NASA.  NASA represented that it was party to a valid LPA with the Union both at the time when it responded to the RFP and when it entered into the Franchise Agreement.  It maintained that position throughout 2017, to its benefit.

By failing to promptly repudiate the LPA—and by reaping the benefits of the LPA throughout 2017—NASA waived its claim that the LPA is inoperative.[2]

## IV. NASA Is Required to Pay the Union's Legal Expenses as a Matter of Contract.

The parties agreed contractually that a party that "unsuccessfully resists arbitration or an arbitration award under this Agreement shall be liable for the other party's legal fees and expenses for enforcement."  Doc. No. 1, Exh. A, at ¶ 14.  This contractual rule is unqualified.  It does not include an exception for resistance to arbitration based on a good-faith belief or a substantially justified legal position.

Accordingly, if the Court grants the Union's motion to compel arbitration, it should require that NASA pay the legal fees and expenses that the Union has expended in bringing this action.

---

[2] Alternatively, NASA is equitably estopped from taking this position. *See Morgan v. Gonzales,* 495 F.3d 1084, 1092 (9th Cir. 2007) (outlining traditional elements of equitable estoppel). "[E]quitable estoppel is available in actions under ERISA and the LMRA." *Directors of Motion Picture Indus. Pension Plan v. Nu Image Inc.*, No. 2:13-CV-03224-CAS, 2014 WL 808859, at *2 (C.D. Cal. Feb. 28, 2014).

## CONCLUSION

For the foregoing reasons, the Court should grant the Union's motion to compel arbitration and order NASA to pay the Union's reasonable attorneys' fees and costs in bringing this action.

Dated: July 23, 2018         Respectfully Submitted,


McCRACKEN, STEMERMAN & HOLSBERRY LLP


By:   */s/Paul L. More*
      Paul L. More
      Attorneys for Petitioner

25

# PROOF OF SERVICE

## STATE OF CALIFORNIA, CITY AND COUNTY OF SAN FRANCISCO

I am employed in the city and county of San Francisco, State of California. I am over the age of eighteen years and not a party to the within action; my business address is: 595 Market Street, Suite 800, San Francisco, California 94105.

On July 23, 2018 I served a copy of the following document(s) described as:

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 396's BRIEF IN SUPPORT OF MOTION TO COMPEL ARBITRATION**

on the interested party(ies) to this action as follows:

**_By ECF System - Court's Notice of Electronic Filing:_**

L Brent Garrett
Atkinson Andelson Loya Ruud and Romo
12800 Center Court Drive South Suite 300
Cerritos, CA 90703
562-653-3200
Fax: 562-653-3333
Email: bgarrett@aalrr.com

*Attorneys for NASA Services, Inc.*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 23rd day of July 2018, at San Francisco, California.

Katherine Maddux

1